# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 29, 2005

## STATE OF TENNESSEE v. GARY STEPHEN MAYES

**Direct Appeal from the Criminal Court for Knox County**
**No. 77344      Richard R. Baumgartner, Judge**

---

**No. E2004-02344-CCA-R3-CD - Filed October 3, 2005**

---

The defendant, Gary Stephen Mayes, was indicted by the Knox County Grand Jury on two counts of especially aggravated sexual exploitation of a minor, a Class B felony, and one count of stalking, a Class E felony.  The trial court dismissed one of the sexual exploitation counts at the end of the State's proof; and, at the conclusion of the trial, the jury convicted the defendant of the remaining sexual exploitation count but acquitted him of the stalking count.  The trial court subsequently sentenced the defendant as a repeat, violent offender to life imprisonment without the possibility of parole, pursuant to the provisions of Tennessee Code Annotated section 40-35-120.  In a timely appeal to this court, the defendant raises the following issues: (1) whether the trial court erred by not severing the stalking count of the indictment; (2) whether the trial court erred by denying his motion to suppress the videotape he made of the child victims; and (3) whether the evidence was sufficient to sustain his conviction.  Following our review, we conclude that the trial court committed harmless error by not severing the stalking offense, that it properly denied the defendant's motion to suppress the videotape, and that the evidence is sufficient to sustain the defendant's conviction.  Accordingly, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee (on appeal); David D. Skidmore, Assistant Public Defender, and Stephen Burroughs, Knoxville, Tennessee (at trial), for the appellant, Gary Stephen Mayes.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leland L. Price and Debbie Herron, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

Many of the essential facts in this case are not in dispute. On October 5, 2002, the eleven-year-old victim, R.B.,[1] was playing outside a Knoxville church near her home when the fifty-three-year-old defendant approached her and initiated a conversation by asking if she had seen his lost dog. By the end of the conversation, R.B., who had been joined by her friend, J.E., had given the defendant her telephone number and accepted his invitation to meet him for a picnic at the church the next afternoon. The following day, the defendant approached R.B. outside her home, gave her some gum, and reminded her of her promise to picnic with him at the church grounds. When R.B. and two of her friends, J.E. and Heather Harrison, went to the church later that afternoon, the defendant led them to a recessed area of the grounds near a side entrance to the church, in an area that was partially hidden from view of the surrounding streets and houses. After the girls had finished their picnic, the defendant took their photographs with a disposable camera, instructing them to lift their shirts to reveal their navels. He then began videotaping them with a video camera, focusing on their breasts and pubic areas as they posed, at his direction, draped over a metal handrail and alternately squatted, sat, and stood on both a window ledge and a narrower ledge that formed part of the outside wall of the church.

The defendant's activities were halted by the arrival of Heather's mother, Elizabeth Harrison, who had been alerted by Heather's older brother, Ryan, that a strange man was with his sister at the church. Although the defendant acquiesced in Ms. Harrison's request to see his driver's license, he fled on foot toward the front of the church when she began calling 9-1-1 on her cell phone, carrying his video camera in one hand and a small cooler in the other. At that point, Ryan followed the defendant on his bicycle while Ms. Harrison ran in the other direction to the rear of the church, removed the keys the defendant had left in the ignition of his van, and read the vehicle's license plate number to the 9-1-1 dispatcher. When the defendant reached the van, he was still carrying the cooler but no longer had the video camera. Knoxville police officers who responded to the scene spent approximately thirty minutes searching for the video camera along the route the defendant had fled. Questioned by police officers without being informed of his Miranda rights, the defendant ultimately revealed the location of the camera.

The defendant's subsequent indictment on two counts of especially aggravated sexual exploitation of a minor was based on the scenes he had videotaped of two of the three girls, J.E. and R.B. The stalking count of the indictment was based on the defendant's admission that he had gone on October 7, 2002, to R.B.'s home; the report of R.B.'s mother that a man she believed to be the defendant had telephoned her home on October 7, 2002, demanding to speak to R.B.; and R.B. and her mother's accounts of having spotted the defendant peering into their apartment windows from their backyard on the afternoon of Saturday, October 12, 2002.

---

[1]It is the policy of this court to refer to minor victims of sexual abuse by their initials only.

## Suppression Hearing

Among numerous other pretrial motions, the defendant filed a motion to suppress the October 6, 2002, videotape of the victims, arguing that because the officers obtained their information as to the video camera's location by their unlawful custodial interrogation of him at the scene, the videotape should have been suppressed under the "fruit of the poisonous tree" doctrine. At the March 11, 2004, hearing on that motion, Ryan Harrison testified the defendant was carrying the video camera as he followed him on his bicycle down an alley and still had the camera when Ryan passed him as they neared the defendant's van, but no longer had it by the time he reached the van. Ryan, therefore, surmised that the defendant had hidden the camera in some bushes near the vicinity of the van. He testified he told his mother where he believed the defendant had hidden the camera, and she relayed that information to the police. According to Ryan, the camera was eventually found in a different clump of bushes approximately ten feet from the area he had indicated. He said he saw one or two police officers searching for about five minutes in the clump of bushes where the camera was located, but he had gone part way down the alley and was not actually present when the camera was found.

Elizabeth Harrison testified she arrived at the church to find her daughter and her two friends talking with the defendant outside the building where food and candy wrappers were scattered on the ground beside them. She said she informed the defendant that her daughter did not have permission to receive food from a man she did not know and that she needed to see some identification. When the defendant stood and handed her his driver's license, she saw the video camera on the ground beside him. Ms. Harrison testified that the combination of the camera, food wrappers, and a book on dogs she saw lying on the ground nearby prompted her to call 9-1-1 on her cell phone. She said that the defendant, who appeared anxious, took a step away from her and she reacted by grabbing the strap of his overalls. The defendant then became very upset, ordered her not to touch him, and informed her that he had been raped by a woman when he was sixteen. When she released him, he turned and fled toward the front of the church carrying the video camera in one hand and a small cooler in the other.

Ms. Harrison testified that her son followed the defendant on his bicycle while she ran to the back of the church, where she spotted a minivan she did not recognize. When her son rode up on his bicycle and told her the minivan belonged to the defendant, she removed the keys from the ignition and began reading the license plate number to the 9-1-1 dispatcher. At that point, the defendant, still holding the cooler in one hand but no longer carrying the video camera, arrived at the van. Ms. Harrison testified that although she did not see the defendant hide the camera, she had an idea of its general location because she knew the route the defendant had taken in his flight around the church. She said she and others therefore "looked in that very small area that he had traveled for the video camera." She also stated that her son repeatedly informed the police officers that the camera had to be hidden in the bushes.

Ms. Harrison explained that Officer Sexton, who responded to her 9-1-1 call, placed the defendant in handcuffs because he refused to stay in the spot he had been instructed to wait while

Officer Sexton interviewed the girls. On cross-examination, Ms. Harrison acknowledged that she was a reserve officer with the Knoxville Police Department and that Officer Sexton did not inform the defendant of his Miranda rights when he handcuffed him. She further testified that she was employed as a park patrol officer at the World's Fair park and was in that uniform when she confronted the defendant.

Knoxville Police Officer Darrell Sexton testified he was trying to find out from the girls what had happened when he heard voices raised, looked over, and saw the defendant stand and take a few steps toward his van. He, therefore, returned to the defendant and handcuffed him pending further investigation. Officer Sexton testified he and his fellow officers knew the general location in which the camera was hidden from information they had received from the children as well as the defendant's footprints that were visible in the grass. However, because searching through the bushes was difficult, he asked and received the defendant's assistance in locating the camera. He explained:

> At one point [the defendant] had been placed in the back of a police car, and I . . . told him at that time I had to go swimming in the bushes to find his camera, and he was back there for a short period of time and he got out with Sergeant McCarter, and he hollered to me . . . "Officer Sexton, if you take these handcuffs off, I'll get the camera."

Asked what the officers would have done if the defendant had not cooperated, Officer Sexton replied that they "were going to search the area until [they] found the camera." Further, he expressed his belief that they would have been successful, noting that Ryan Harrison had pointed out the general location in which the camera was hidden and that the area they had to search was only "[r]oughly" the size of an "overgrown backyard." On cross-examination, he conceded he had not informed the defendant of his Miranda rights before asking for his assistance in locating the camera. He acknowledged his conversation with the defendant about the camera lasted twenty to thirty minutes, and two or three other officers were searching for the camera during that time. He stated, however, that for most of that time the officers were not looking through the bushes, but instead were "kicking around [a] shed," in the area the defendant "initially said . . . he . . . put" the camera.

At the conclusion of the hearing, the trial court denied the defendant's motion to suppress, concluding that although the defendant's Fifth Amendment rights had been violated by his custodial interrogation without Miranda warnings, the video camera would have inevitably been discovered without the defendant's assistance. Following its ruling on the suppression issue, the trial court heard testimony with respect to the defendant's motion to sever offenses. At its conclusion, the court denied the motion on the basis that the stalking and especially aggravated sexual exploitation offenses were all part of a common scheme or plan. Thereafter, on June 1, 2004, the defendant proceeded to trial on all three counts of the indictment.

## Trial

The State's first witness was the victim, R.B., who testified that she was born on April 2, 1991, and was currently thirteen years old. She said that on October 5, 2002, her friend J.E. had gone to her house to get a band-aid, leaving R.B. alone in front of the neighborhood church. As she waited, the defendant approached and asked if she had seen his lost dog and she told him she had not. As she was talking to the defendant, who told her he was a janitor at the church, J.E. joined them and the defendant began "talking . . . really nasty" about his daughter having sex with his dog. R.B. said that during the course of the conversation the defendant asked her to meet him at the church for a picnic the next day, and she agreed.

R.B. testified she was in her yard the following day when the defendant walked up to her from the alley, gave her some gum, and reminded her to join him at the church for a picnic at 2:30 p.m. When she and her friends, J.E. and Heather Harrison, went to the church, the defendant met them with cokes, donuts, cookies, and food from McDonald's. After rejecting the spot R.B. proposed on the lawn beside the street and a second location behind a shed, the defendant led the girls down some steps to a small grassy area near a side entrance to the church for their picnic. As they ate, the defendant showed the girls pictures of different dogs that were in a book he had brought with him.

R.B. stated that after their meal the defendant began photographing the girls with a disposable camera, telling them to "pull up [their] shirts where it showed [their] belly buttons." The defendant then began filming the girls with a camcorder as they played around the area. R.B. said that at one point when her friends had chased each other around to the back of the church, the defendant pulled her to him and kissed her on the lips. She stated that she pulled away at about the same time her friends came running back. She did not see the defendant kiss or attempt to kiss either of her friends. She testified that Heather's brother later came by, followed a short time later by Heather's mother and then the police.

R.B. testified she became a little frightened when the police placed the defendant in handcuffs and was very frightened the next day when she heard her mother get upset after receiving a telephone call. She said she was even more frightened when she and her mother later saw the defendant walking around their backyard looking up at their apartment windows. R.B. testified her mother called the police at that time, but the defendant left on his motorcycle before the police arrived.

Nancy Slagle, R.B.'s mother, testified she first saw the defendant on Sunday, October 6, after the police had been called to the church. She said that the following day a man telephoned her home asking for her daughter and when she asked who was calling, the man repeated that he wanted to speak to R.B. She then asked the caller, "Is this the man from up at the church yesterday?" and he replied, "This is Gary Bussie," and she hung up the telephone. Ms. Slagle testified she next saw the defendant on Saturday, October 12, when she spotted him walking from the backyard of her apartment building to the front while gazing up into their apartment's windows. She said she called

R. B. to the window to confirm that it was the defendant and telephoned the police. By the time the police arrived, however, the defendant had left.

The parties stipulated that Ms. Slagle's 9-1-1 call, in which she stated that the defendant was standing in her backyard at the time, was placed at 4:44 p.m. On cross-examination, Ms. Slagle acknowledged that R. B. was not at home when she received the October 7 telephone call and that the caller did not threaten her or R. B.

The State's next witness was Elizabeth Harrison, whose trial testimony essentially mirrored the testimony she had provided at the suppression hearing. On cross-examination, she acknowledged that anyone walking or driving down Washington Avenue, the street that ran beside the church, would have had a direct line of sight to the area where the defendant and the girls had picnicked. On redirect examination, however, she confirmed that the picnic area was down an incline and that the straight line of sight to it from the street was therefore "fairly narrow." She further testified that, given the distance, she did not know whether a person traveling on the sidewalk or street would "be able to tell what was happening from Washington Avenue."

Officer Darrell Sexton described for the jury his response to the scene and his subsequent retrieval of the camera with the defendant's assistance. On cross-examination, he testified that he and other officers later searched the defendant's house with his consent but did not find any child pornography in the areas the defendant allowed them to search. He acknowledged the defendant did not have any weapons and never threatened to harm anyone.

Janice Gangwer testified she worked in the forensic unit of the Knoxville Police Department and collected the camcorder from the scene of the incident. She identified the videotape from the camera which was subsequently played for the jury and admitted as an exhibit.

Per stipulation, the State introduced into evidence the defendant's waiver of rights form, a redacted version of the defendant's taped interview with Knoxville Police Department Investigator Starr Perrin, and Perrin's preliminary hearing testimony, which was read into evidence by the prosecutors and defense counsel. In that hearing, Investigator Perrin testified that the defendant told her he had not done anything other than videotape the girls, that he only wanted to be their friend, that R.B. had given him her telephone number, and that he had gone to R.B.'s home the day after the incident to apologize to her mother. She said the defendant denied he was at R.B.'s home on October 12. She testified the defendant was released from custody after he had given the officers consent to search his home and they had confiscated his cameras. On cross-examination, Investigator Perrin conceded that when the defendant was released from custody on October 6 she advised, rather than ordered, him to stay away from the girls.

After the State rested its case, the trial court granted the defendant's motion to dismiss the especially aggravated sexual exploitation count of the indictment with J.E. as the named victim, on the basis that the State had failed to sufficiently identify which girl on the videotape was J.E. The trial then continued with the presentation of the defendant's proof, which consisted of several alibi

witnesses for the October 12, 2002, date the defendant was alleged to have stalked R.B. at her apartment. Specifically, the defendant's girlfriend testified he was with her at a car show until approximately 3:30 p.m. when he left on his motorcycle to take some barbeque to his parents' house; the defendant's father testified that the defendant arrived at their house at exactly 3:50 p.m. and left at 4:15 p.m.; and two of the defendant's acquaintances testified that, after leaving his parents' house, the defendant visited with them at an airfield across the road for thirty minutes to an hour.

## ANALYSIS

### I. Denial of Motion to Sever Offenses

As his first issue, the defendant contends that the trial court erred by denying his motion to sever the stalking count from the especially aggravated sexual exploitation counts of the indictment. He argues that the offenses were not part of a common scheme or plan and that evidence of the stalking offense was not material or relevant to the sexual exploitation offenses. He further argues that evidence in support of the stalking count, in particular the vulgar comments he made to the victim about his daughter having sex with his dog, was extremely prejudicial to his sexual exploitation case. The State responds by arguing, alternately, that the trial court properly denied the motion to sever and that its refusal to sever the offenses constituted harmless error.

The defendant moved to sever the offenses pursuant to Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure. A trial court's "decisions to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) are to be reviewed for an abuse of discretion." State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999). Rule 14(b)(1) provides that if offenses have been consolidated pursuant to Rule 8(b), which allows for the permissive joinder of offenses deemed part of a common scheme or plan or of the same or similar character, "the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1). "[A] trial court's refusal to sever offenses will be reversed only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Shirley, 6 S.W.3d at 247 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Before denying a motion to sever offenses, the trial court should conclude that: (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of one offense is relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect caused by the admission of the evidence. Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000) (citing State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984)).

There are three categories of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to be considered "signature crimes"; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. Shirley, 6 S.W.3d at 248 (citing Neil P. Cohen et al., Tennessee Law of Evidence §

404.11, at 180 (3d ed.1995)).  In this case, the trial court found the separate offenses to be part of a continuing plan or conspiracy:

> So the question is then, should they be severed under Rule 14?  And it says that if two or more offenses have been joined or consolidated for trial pursuant to Rule 8, a defendant shall have a right to the severance of offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the others.
>
> And I've already made the observation, if you believe the state's case, this is one continuing criminal episode with a common scheme or plan to -- to the end that the state says [the defendant] was headed, and that is, to, first of all, obtain offensive pictures of these young ladies and to stalk them, again, if the . . . jury believes the state's proof, and they're able to prove the offenses beyond a reasonable doubt.

When defense counsel later renewed his motion to sever, arguing that the evidence with respect to the stalking offense was irrelevant and immaterial to the sexual exploitation offenses, the trial court again denied the motion, stating:

> I think . . . I made that finding, that in my judgment this is one continuous criminal episode and . . . so I would agree with you that . . . all of the evidence related to anything that transpired that week is all part of one continuing criminal episode, even though it involves more than one charge.  I mean, . . . just like you can rob a store and steal, you can – in this case, in my judgment, it's all the same thing[.]

We agree with the defendant, however, that the stalking count should have been severed from the sexual exploitation counts of the indictment.  As our supreme court has observed:

> [T]he "primary issue" to be considered in any severance case is whether evidence of one offense would be admissible in the trial of the other if the two offenses remained severed.  See State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984).  In its most basic sense, therefore, any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is "really a question of evidentiary relevance."  State v. Moore, 6 S.W.3d 235, 239 (Tenn. 1999); see also Shirley, 6 S.W.3d at 248.

Spicer, 12 S.W.3d at 445.  Here, although evidence of the defendant's photographing and videotaping of the girls would have been relevant and admissible in a separate trial on the stalking offense in order for the State to show why the victim and her mother were afraid of the defendant, his alleged attempts to contact the victim after the videotaping incident have no relevance to whether his actions during that videotaping episode constituted the offense of especially aggravated sexual exploitation of a minor.

We disagree, however, with the defendant's contention that the stalking evidence introduced at trial unfairly prejudiced his case, thereby warranting him a new trial on the sexual exploitation charge. In most severance cases, "the line between harmless and prejudicial error is in direct proportion to the degree . . . by which the proof exceeds the standard required to convict, beyond a reasonable doubt." Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979); see also Spicer, 12 S.W.3d at 447; Shirley, 6 S.W.3d at 250. As we will discuss in more detail later in this opinion, the State presented ample evidence in support of the defendant's especially aggravated sexual exploitation of a minor conviction. It was undisputed that the defendant was the one who videotaped the children. Thus, the only real issue at trial with respect to this offense was whether the images contained on the videotape included those of a "minor engaging in . . . sexual activity." See Tenn. Code Ann. § 39-17-1005 (a). As such, the essential evidence against the defendant, and the evidence that led to his conviction, was the videotape itself.

Furthermore, we disagree with the defendant that the sexual comments he made to the victim about his dog would not have been admissible in the sexual exploitation case had the offenses been severed. Unlike the defendant's alleged subsequent attempts to contact the victim after the videotaping incident, these sexual comments occurred in the context of his initial conversation with the victim in which he invited her to join him for the picnic where the videotaping took place. The comments were, thus, relevant and admissible to show the defendant's intention in inviting the girls to the picnic and whether the scenes he filmed of them while there were intended to invoke a sexual response in the viewer. We, therefore, conclude that the trial court's denial of the defendant's motion to sever offenses constituted harmless error. See Tenn. R. Crim. P. 52(a).

## II. Denial of Motion to Suppress Videotape

The defendant next contends the trial court erred in denying his motion to suppress the videotape of the child victims, arguing that the officers would not have found the video camera without his assistance and that the videotape was therefore the fruit of his unlawful custodial interrogation at the church. The State disagrees, arguing that the evidence preponderates in favor of the trial court's finding that the video camera would have inevitably been discovered without the defendant's cooperation. We agree with the State.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The State concedes that the defendant's Fifth Amendment rights were violated by the officers' custodial interrogation without first providing a <u>Miranda</u> warning. Ordinarily, evidence obtained through a violation of a suspect's constitutional rights must be excluded at trial. <u>See, e.g.</u>, <u>Wong Sun v. United States</u>, 371 U.S. 471, 485, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963); <u>Mapp v. Ohio</u>, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). However, an exception exists for evidence that the State can show would have been inevitably discovered through routine police investigation. <u>See</u> <u>Nix v. Williams</u>, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." <u>Id.</u> 467 U.S. at 444 n.5, 104 S. Ct. at 2509 n.5.

The defendant characterizes the trial court's finding that the officers would have inevitably located the video camera on their own as "speculative." We respectfully disagree. According to the State's proof, there were only a few, limited areas the officers would have had to search in order to locate the camera on their own. Officer Sexton estimated the area to be searched was roughly the size of an overgrown backyard, and both Ryan Harrison and his mother testified that there was only a small area in which the camera could have possibly been hidden. Moreover, Ryan Harrison stated that the camera was found approximately ten feet from the clump of bushes he had pointed out as its likely hiding place. The testimony of these witnesses clearly supports the finding that the camera inevitably would have been found by lawful means had the police not received the defendant's assistance. We, conclude, therefore, that the trial court properly denied the defendant's motion to suppress the incriminating videotape of the children.

### III.  Sufficiency of the Evidence

As his final issue, the defendant challenges the sufficiency of the evidence in support of his conviction. In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); <u>see also</u> Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); <u>State v. Evans</u>, 838 S.W.2d 185, 190-92 (Tenn. 1992); <u>State v. Anderson</u>, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. <u>See</u> <u>State v. Pappas</u>, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." <u>State v. Grace</u>, 493 S.W.2d 474, 476 (Tenn. 1973). Finally, a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. <u>See</u> <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of a violation of Tennessee Code Annotated section 39-17-1005, which provides in pertinent part that "[i]t is unlawful for a person to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance or in the production of material which includes the minor engaging in (1) [s]exual activity." Tenn. Code Ann. § 39-17-1005(a)(1) (2003). For the purposes of this case, "sexual activity" is defined as "[l]ascivious exhibition of the female breast or the genitals or pubic area of any person." Tenn. Code Ann. § 39-17-1002(7)(G).

The defendant argues that the videotape does not show a minor engaging in sexual activity because it "contains no display of anyone's breast, genitals, or pubic area." In support of this contention, the defendant primarily relies on the fact that the girls remain clothed throughout the film. However, whether a child is clothed or nude in a visual depiction is merely one of a number of factors to be considered in determining whether material contains a "lascivious exhibition of the female breast or the genitals or pubic area." In State v. Larry Dixon, No. 01C01-9802-CC-00085, 1998 WL 712344, at *2 (Tenn. Crim. App. Oct. 13, 1998), perm. to appeal denied (Tenn. Mar. 1, 1999), this court adopted the test used by federal courts, developed in United States v. Dost, 636 F. Supp. 828 (S. D. Cal. 1986), aff'd sub nom. United States v. Wiegand, 812 F.2d 1239 (9th Cir. 1987), cert. denied, 484 U.S. 856, 108 S. Ct. 164, 98 L. Ed. 2d 118 (1987), for determining whether a visual depiction of a minor constitutes the lascivious display of the female breast, genitals or pubic area, under Tennessee's sexual exploitation of a minor statute. Under this test, a court should consider the following six factors:

> (1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

> (2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

> (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

> (4) whether the child is fully or partially clothed, or nude;

> (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

> (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

Dost, 636 F. Supp. at 832. As previously stated, all six factors need not be present for the material to constitute "'a lascivious exhibition of the genitals or pubic area.'" Id. Instead, the determination is to be "made based on the overall content of the visual depiction, taking into account the age of the minor." Id.

After viewing the videotape, we have no hesitation in concluding that the images of the victim meet the definition of the "lascivious exhibition" of the female breast or pubic area. While none of the girls were unclothed, the videotape contains numerous close-up images of the victim's breasts and crotch. Moreover, with the exception of when the camera zooms in on the victim's clothed crotch area as the defendant instructs her, "Sit down. Take your shoes off. Now take your socks off," the scenes were filmed as the victim assumed unnatural and obviously uncomfortable positions. In one instance, the victim is standing with her friends on a very narrow ledge outside the church approximately three or four feet above the ground. It is unclear from the videotape how long the girls have been standing there, but the victim asks the defendant, "Can we get off now? It's getting really -- I want off this!" In another instance, the victim is leaning her torso and arms across the top rail of a handrail as she grasps hold of a second rail that is approximately two feet below the top rail. She grimaces, says, "Ouch!" and asks, "Can I get up now?" while the defendant zooms the camera lens down the front of her gaping shirt to her breasts, where he focuses at length. During this time, the defendant says, "Wait a minute. I want a real close-up," and then, "I'm going to make a real movie star out of you!" Thus, factors (1), (3), and (6) of the <u>Dost</u> test are clearly met in this case.

Factor (5), "whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity," is arguably met as well. At another point in the videotape, the defendant pulls the victim to him, saying, "I want a kiss," and then films himself kissing her on the corner of her mouth. Still later, no doubt in response to encouragement or direction from the defendant, the victim jumps off a step, quickly kisses the defendant on the cheek as she giggles nervously, and then retreats to her former position. The defendant also instructs the girls to "show me" as he focuses his camera on their navels while they lift their shirts for his view.

In sum, the tender age of the victim, combined with the presence of the aforementioned <u>Dost</u> factors, leads us to conclude that the images clearly depict a minor engaging in "sexual activity" under the "lascivious exhibition of the female breast or the genitals or pubic area" definition of the statute. The evidence, therefore, is sufficient to sustain the defendant's conviction for especially aggravated sexual exploitation of a minor.

## <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE